## A10A1452. KESTERSON et al. v. JARRETT et al.

(704 SE2d 878)

ELLINGTON, Judge.

Catherine and Ross Kesterson, individually, and their minor daughter, Kyla, by and through her parents, appeal from a jury verdict and final judgment in favor of the defendants in this medical malpractice case. Following a bifurcated trial on the issue of liability, the jury returned a verdict in favor of Walter Jarrett, M.D., Athens Obstetrics and Gynecology, P.C., and St. Mary's Healthcare System, Inc. d/b/a St. Mary's Hospital. On appeal, the Kestersons contend the State Court of Clarke County erred in granting the defendants' request to limit Kyla's presence in the courtroom during the liability phase of the trial, in limiting their cross-examination of Jarrett, and in excluding video evidence offered to illustrate Kyla's injuries. For the reasons that follow, we find no reversible error and affirm the jury's verdict.

Viewed in the light most favorable to the jury's verdict,[1] the record shows the following facts relevant to this appeal. At about 6:15 a.m. on October 20, 1998, Catherine Kesterson ("Kesterson") was admitted to St. Mary's Hospital so that her obstetrician, Jarrett, could induce labor. Jarrett administered Pitocin, a medication used to stimulate uterine contractions. The hospital nursing staff connected Kesterson to a fetal heart rate monitor, an external device which generated printed information documenting any changes in the fetus' heart rate. The nurses monitored Kesterson's labor until she delivered Kyla at 8:15 p.m. Jarrett examined Kesterson at 2:30 p.m., 4:00 p.m., and 5:45 p.m. During the last examination, Jarrett noted that Kesterson was in active labor, but that her cervix was not sufficiently dilated to deliver. Jarrett ordered an epidural for Kesterson and then went to a meeting, leaving his patient in the care of his partner, Dr. Van Herrin.

The day nurse, who was present until 7:00 p.m., did not observe anything about Kesterson's labor, including any changes in the fetus' heart rate, that caused her concern. Although she noted "variable decelerations" of the fetus' heart rate, those were either associated with Kesterson's contractions or related to the fact that she was sitting up for an epidural, and the nurse did not consider them to be unusual. When the evening nurse came on duty at 7:00 p.m., she reviewed the fetal heart rate monitor and noted: "Fetal heart rate with minimal variability; occasional variable decel, some late occurring; patient turned to full right lateral position." Nothing she

---

[1] A reviewing court must view the evidence in the light most favorable to upholding the jury's verdict. *Stubbs v. Harmon*, 226 Ga. App. 631, 632 (1) (a) (487 SE2d 91) (1997).

observed caused her to be concerned. Around 7:34 p.m., the evening nurse observed that the heart rate monitor had registered a more significant deceleration of the fetus' heart rate and that it was not returning to normal as quickly as it had before, suggesting a deceleration unrelated to contractions. After giving Kesterson oxygen, the nurse paged Herrin and relayed her observations. Herrin responded within minutes, examined Kesterson, and ordered an emergency Caesarean section. Shortly thereafter, he delivered Kyla.

Kyla was born with very low "Apgar scores," a gross assessment of the infant's medical condition at specific intervals after birth. Within a day of her delivery, Kyla had a brain ultrasound and CT scan, neither of which revealed any injury. A week later, an MRI of Kyla's brain revealed damage to parts of the brain that control motor function. Kyla was eventually diagnosed with spastic quadriplegia, a form of cerebral palsy. As a result of this condition, Kyla is unable to control her movements and is confined to a special wheelchair, she has a feeding tube inserted into her stomach, her airway must be suctioned several times a day, she has bladder and bowel dysfunction, she suffers frequent seizures, she has severely limited cognitive function, and she cannot speak.

The Kestersons contended at trial that Kyla's neurological injuries occurred when she was deprived of oxygen just prior to birth. They argued that the nurses and Jarrett were negligent in failing to timely recognize the signs of fetal distress and that if Jarrett had performed a Caesarean section earlier, Kyla would not have been injured. The defendants argued that their actions did not fall below the standard of care, that an earlier Caesarian section was not medically indicated, and that Kyla's cerebral palsy may have resulted from something other than an event that occurred during delivery.

1. The Kestersons contend that the trial court "erred in granting [the] defendant's motion to ban Kyla from the courtroom during the trial." Under the unique circumstances of this case and for the following reasons, we hold that the trial court's carefully considered decision to limit Kyla's presence in the courtroom during the liability phase of the trial did not constitute reversible error.

(a) *Relevant Facts.* Following a hearing, the trial court entered an order granting the defendants' request to bifurcate the trial, separating the issues of liability and damages. The court held that "any testimony related to monetary damages is irrelevant to the liability portion of the trial." The court held that all evidence of damages, including pain and suffering, "shall be reserved until such time as Plaintiff has established malpractice by one or more of the Defendant[s]." The Kestersons do not contend that the court erred in bifurcating the trial.

After the court ordered the trial bifurcated, the defendants

moved to exclude Kyla from the liability phase of the trial. The defendants attached as exhibits to the motion the detailed medical assessments of Kyla by two doctors. Both doctors described Kyla's severe injuries, profoundly limited cognitive function, and the daily medical care and equipment required to keep her alive. On the issue of her cognitive functioning, one doctor noted that Kyla's "[s]peech and language exam was notable for crying, but no response to sounds, voices, and no oral utterance except for cries. I do not believe the child is [able to respond to yes or no questions with an] eyeblink."

The court conducted an evidentiary hearing on the motion, during which the Kesterson's counsel made the following statements: "[W]e never envisioned that [we would] bring Kyla Kesterson to this courtroom and leave her in the courtroom during . . . the entire trial. . . . We would never subject her to that." "Kyla is represented in this action by her parents." "[W]e should not be limited from . . . introducing her to the jury even during the liability phase of the trial. . . . It will be very, very short, and then . . . she will probably be out of here for the rest of [the liability] phase."

> [W]e have no intention of bringing Kyla Kesterson in. Number one, it wouldn't be right to do it. We can't do it for long, long periods of time. . . . But there may be some limited appearances that we may have of her, and we have a right, we believe, to use a picture and a video of her during the liability phase.

Following the hearing, the court entered a written order finding as follows:

> [Kyla Kesterson] currently has severe and permanent neurological disabilities and brain damage, is immobile and in a wheelchair, suffers frequent seizures, has a feeding tube, requires suctioning of her airway several times a day, suffers from bladder and bowel dysfunction, and is unable to communicate other than by a few gestures, crying and making loud noises.

The court also noted that "Plaintiffs responded that [Kyla] will not be brought into the courtroom for any lengthy period of time." After restating the parties' positions on the question of whether Kyla's presence in the courtroom during the liability phase of the trial was unduly prejudicial, and after finding that Kyla's interests were protected by her parents, who would be present in the courtroom,

the court concluded:

> The Court shall allow Plaintiff Kyla Kesterson in the court-room at the time of the call of the case for trial immediately prior to voir dire of the jury panel. After introduction of [Kyla] to the jury panel, the child's presence during the liability phase of the trial shall not be allowed until the Court, outside of the jury's presence, determines that the presence of such child is essential and relevant to witness testimony related to medical conditions affecting said child which resulted from alleged negligent acts by one or more Defendants. . . . However, the Court reserves the right to remove [Kyla] from the courtroom at any time the Court perceives that her actions are distracting or disruptive to the proceedings or otherwise result in potential prejudice to one or more of the defendants.

The record reflects that the Kestersons brought Kyla into the courtroom briefly during voir dire before voluntarily removing her. Thereafter, pursuant to the court's rulings, the Kestersons made three requests to bring Kyla into the courtroom. They asked that Kyla be present during the testimony of a physician who treated Kyla in the month following her birth but who had not since examined her. The court denied the request, finding that Kyla's presence was not "necessary with respect to giving any opinions that he [could] give" concerning his past treatment. The Kestersons also asked that Kyla be present during Catherine Kesterson's testimony to illustrate to the jury Kyla's physical injuries and disabilities and to establish the nature of her medical condition and whether the defendants caused Kyla's condition. The defendants responded that Kyla's condition and its cause were "medical, technical" issues. After weighing the prejudice to the defendants (noting that Kyla's presence had an emotional impact on some of the jurors during voir dire) and concluding that Kyla's mother could not give any medical testimony concerning Kyla's condition, the court denied the request. Upon the Kestersons' third request, the trial court agreed to allow Kyla in the courtroom during the cross-examination of a defense expert, so that the doctor could observe Kyla and respond to questions about whether Kyla had facial features consistent with the type of injury alleged by the Kestersons.

(b) *Applicable Law.* "Generally, parties[2] to civil actions in this

---

[2] Although Kyla, as a minor, "is required to appear through a guardian or next friend, [she] is the real party in interest." *Clements v. Phillips*, 235 Ga. App. 588, 589 (1) (510 SE2d 311) (1998). See OCGA § 9-11-17 (c) ("Whenever an infant or incompetent person has a

State have the right to be present at all stages of the trial." (Citation omitted.) *Cox v. Yates*, 96 Ga. App. 466 (3) (100 SE2d 649) (1957). Nevertheless, this right is not absolute, as the Supreme Court of Georgia has permitted trial judges, in the exercise of their discretion, to exclude parties from civil trials under certain circumstances. See *Willingham v. Willingham*, 192 Ga. 405, 408 (2) (15 SE2d 514) (1941) (affirming exclusion of parties from courtroom during examination of their children in a divorce trial, where parties' attorneys were present and able to cross-examine the children and where the welfare of the children was a principal issue before the court). A number of other courts have also concluded that a civil litigant's right to be present is not absolute.[3] Although we have found no Georgia case law expounding upon the constitutional or statutory source of a civil party's qualified right to be present during trial,[4] we agree with the analysis of the United States Court of Appeals for the Sixth Circuit, which held that a civil litigant's right to be present at trial is protected by the constitutional right of due process of law.[5]

---

representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may bring or defend an action on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative, he may bring an action by his next friend or by a guardian ad litem.").

[3] See *Onaka v. Onaka*, 146 P3d 89, 96 (III) (B) (Haw. 2006) ("Although it is generally acknowledged that civil litigants have a . . . right to be present [at every stage of trial], it is equally clear that the right is not absolute.") (footnotes omitted); *Brown v. Yettaw*, 116 SW3d 733, 735 (Mo. App. 2003) ("Whether a trial court has abused its discretion in proceeding to trial and judgment in the absence of a party or his attorney must be determined upon the particular facts and circumstances in the case under consideration.") (citations and punctuation omitted); *Green v. North Arundel Hosp. Assn.*, 785 A2d 361, 375 (Md. App. 2001) ("[T]here is a right of presence, [but] the right is not absolute[.]"); *In re Robert U.*, 724 NYS2d 527, 529 (N.Y. App. 2001) ("It is now well settled that a litigant does not have an absolute right to be present at all stages of a civil proceeding[.]") (citations omitted); *Nussbaum v. Steinberg*, 162 Misc.2d 524, 618 NYS2d 168, 169 (1994) ("The defendant's right to be present at a civil trial is not absolute[.]"); *In the Matter of Donna K.*, 518 NYS2d 289, 290 (N.Y. App. 1987) ("While every litigant has a fundamental right, guaranteed by the Due Process Clauses of both the Federal and State Constitutions, to be present at every stage of the trial, . . . this right is not absolute in civil actions.") (citations omitted); *Air Products &c. v. Johnson*, 442 A2d 1114, 1128 (Pa. Super. 1982) ("While we recognize that the right of a litigant to be present at the time his case is heard is a cherished right, we also are aware that the right is not absolute.") (citations omitted); *Casson v. Horton*, 174 A2d 581, 582 (Md. App. 1961) (holding that a civil litigant "had no absolute right to be present") (citation omitted).

[4] The Georgia Constitution provides: "No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state." Ga. Const. of 1983, Art. I, Sec. I, Par. XII. In the civil law context, that paragraph has been held to express a right of choice between self-representation and representation by an attorney, and not an "access to the courts" provision. *Crane v. Lazaro*, 281 Ga. App. 127, 127-128 (1) (635 SE2d 319) (2006). This paragraph, however, is often cited for the proposition that a criminal defendant has a constitutional right to be present at every stage of the proceedings materially affecting his case. See, e.g., *Wilson v. State*, 274 Ga. 637, 639 (3) (555 SE2d 725) (2001). The right to a trial by jury, Ga. Const., Art. I, Sec. I, Par. XI, does not contain language expressing a "right of presence" at trial.

[5] The Fifth Amendment to the United States Constitution provides, in relevant part, that no person shall "be deprived of life, liberty, or property, without due process of law[.]" The

*Helminski v. Ayerst Laboratories*, 766 F2d 208, 213 (III) (6th Cir. 1985), cert. denied, 474 U. S. 981 (106 SC 386, 88 LE2d 339) (1985). The *Helminski* court reasoned:

> [S]ince an attorney is merely the representative or agent of the litigant and not the litigant's "alter ego," a court may not exclude arbitrarily a party who desires to be present merely because he is represented by counsel; such exclusion would violate the due process clause of the Fifth Amendment.

(Citations omitted.) Id.

Because no Georgia appellate court has yet to fully articulate those circumstances under which a trial court may exclude a severely injured party from civil proceedings without offending due process of law, we turn for guidance to the decisions of other state and federal appellate courts. After carefully reviewing these decisions, we find persuasive the reasoning employed by the *Helminski* court. See, e.g., *Green v. North Arundel Hosp. Assn.*, 785 A2d 361, 375 (Md. App. 2001); *Hines v. Wilkinson*, 163 FRD 262, 265-268 (III), (IV) (S.D. Ohio 1995); *Province v. Center for Women's Health &c.*, 25 Cal. Rptr. 2d 667, 675 (Cal. Ct. App. 1993) (noting that *Helminski* "surveyed, considered and discussed the rules which had been applied to a broad range of cases" dealing with the exclusion of parties from trial).

The *Helminski* court set forth a two-step inquiry to determine whether a severely injured party's exclusion from trial comports with due process.

> [First,] the defendant who seeks to exclude a handicapped plaintiff must establish at a hearing that the plaintiff's presence would prevent or substantially impair the jury's performance of its fact-finding task. The requisite showing of prejudice cannot be satisfied simply by establishing that a plaintiff has a physical or mental injury; the party seeking exclusion must establish that the party's appearance or conduct is likely to prevent the jury from performing its duty. . . .
> [Second, s]hould the [trial] court determine that the party's mere presence would be prejudicial, the court must next consider whether the party can understand the proceedings and aid counsel. If the trial court concludes that the party can comprehend the proceedings and assist coun-

---

Georgia Constitution similarly provides that "[n]o person shall be deprived of life, liberty, or property except by due process of law." Ga. Const. of 1983, Art. I, Sec. I, Par. I.

sel in any meaningful way, the party cannot be involuntarily excluded regardless of prejudicial impact; in such a case, cautionary instructions will protect the interests of the defendant in a fair trial.

766 F2d at 218. However, if the trial court concludes that the plaintiff's presence would prejudice the jury and the plaintiff would be unable to assist counsel or comprehend the proceedings, then the trial judge should bifurcate the case into separate trials on liability and damages, and then limit the plaintiff's presence only during the liability phase. See id. at 217.

Applying this analysis to the case before us, we hold that a trial court has the discretion to limit a severely injured plaintiff's presence during the liability phase of a bifurcated trial when, after an evidentiary hearing upon a written motion and after an opportunity to observe[6] the plaintiff, the court makes the following factual findings in a written order: (1) the plaintiff is severely injured; (2) the plaintiff attributes those injuries to the conduct of the defendant(s); (3) there is a substantial likelihood that the plaintiff's presence in the courtroom will cause the jury to be biased toward the plaintiff based on sympathy rather than the evidence such that the jury would be prevented or substantially impaired from performing its duty; (4) the plaintiff is unable to communicate with counsel or to participate in the trial in any meaningful way; and (5) the plaintiff is unable to comprehend the proceedings. When all of those circumstances exist, the plaintiff's presence is not truly an exercise of his or her right to be present, because the plaintiff is incapable of making such a conscious choice. As in this case, the plaintiff functions almost as an exhibit, as a piece of evidence.

In this case, the court made all of the requisite factual findings except one. It did not make an explicit finding in its order or elsewhere on the record that there is a substantial likelihood that Kyla's presence in the courtroom would cause the jury to be biased toward her based on sympathy rather than the evidence. Rather, the trial court, relying on the Kestersons' assertions that they intended to bring Kyla in on only a few occasions during the liability phase of the trial, made the prejudice determination only when the Kestersons asked to have their daughter present. It appears that, at each request, the court weighed the prejudice to the defendants against the probative value of Kyla's presence. Only once during those three

---

[6] A court's observation should consist of viewing the plaintiff in person, in a video recording, or through other reliable means, such as through photographs or detailed medical records. Whatever the method of observation, it should be sufficient to provide the court with objective information from which to evaluate items (1) through (5) above.

occasions, however, did the court actually articulate its findings. In that instance, the court noted the jury's emotional reaction to Kyla. This one comment, though, under the analysis we have set forth, would be insufficient as a factual finding that the jury would be prevented or substantially impaired from performing its duty. See *Helminski v. Ayerst Laboratories*, 766 F2d at 218 (III).

Nevertheless, under the unique facts of this case, we conclude that the error was harmless. First, the trial court had no legal precedent from a Georgia appellate court instructing it to make that finding and to reduce it to writing. Second, the record contains facts which would have supported a finding that Kyla's severe injuries would have caused the jury to be biased toward the plaintiff based on sympathy rather than the evidence such that the jury would be prevented or substantially impaired from performing its duty. Third, the court expressly found that Kyla neither could have understood the proceedings nor assisted in the trial of her case and that her interests were adequately represented by counsel and her parents. And finally, the jury in this case viewed Kyla on at least two occasions and was fully apprised of her medical condition and the extent of her injuries through medical testimony and other evidence. Therefore, there was no danger that the jury would be unable to appreciate the nature and severity of Kyla's injuries. *Helminski v. Ayerst Laboratories*, 766 F2d at 218-219 (III). In all future cases, however, trial courts shall make these express findings in a written order prior to limiting a severely injured plaintiff from attending trial, and the failure to do so shall be reversible error. A party's right to be present during trial is a cherished right, one which must be diligently safeguarded.

2. The Kestersons contend that the trial court erred in prohibiting them from cross-examining Jarrett "as to what he would have done if he had been told of the fetus' worsening condition."

The Kestersons attempted to ask Jarrett the following question: Had the labor and delivery nurses informed him at 6:47 p.m. of the first indications of a slowing fetal heart rate, "would [he] have come and assessed the patient?" The trial court sustained an objection to the question on the ground that it "call[ed] for speculation." Although the Kestersons elaborated on why they thought the question was proper, they did not include in their proffer what Jarrett's answer to the question would have been. Before this ruling, however, Jarrett had already testified on direct examination that, had he known about the 6:47 p.m. fetal heart rate reading, he would have done nothing differently: "[I]f you look at the chart, if you look at the fetal tracing, especially, and you follow it as it's coming out of the machine, I wouldn't have done anything differently had I been there[.]"

"We will not reverse a decision of the trial judge concerning

whether to allow a hypothetical question unless there is an abuse of discretion." (Citation omitted.) *Cornelius v. Macon-Bibb County Hosp. Auth.*, 243 Ga. App. 480, 483 (1) (a) (533 SE2d 420) (2000). Pretermitting whether the trial court abused its discretion in sustaining the defendants' objection to the question posed, the Kestersons were not harmed as a result thereof because Jarrett had already answered the question posed on direct examination, and the excluded testimony would have been cumulative. See id. at 483-484 (1) (a) ("Generally, when there is cumulative evidence of the excluded testimony[,] the error may be harmless."); *Thomas v. Statewide Beverage Equip.*, 152 Ga. App. 293, 295 (4) (262 SE2d 575) (1979) (Since the excluded testimony "was merely cumulative evidence, its exclusion could not have prejudiced [the] appellants' case.") (citation omitted).

3. The Kestersons contend that the trial court erred in excluding a DVD containing video clips and photographs of Kyla which showed her injuries and medical condition.

During the liability phase of the trial, Catherine Kesterson gave testimony concerning her labor and delivery and Kyla's injuries. Prior to offering her testimony, the Kestersons asked for permission to play for the jury during Catherine Kesterson's testimony a DVD recording depicting a typical day in Kyla's life. After the defendants objected to the recording, the court viewed it, heard argument concerning it, and excluded it on the ground that the evidence on the DVD related to damages, not liability, and that it was unduly prejudicial in that it played upon the jury's sympathies.

> [G]enerally we do not overrule a trial court's decision in evidentiary matters unless we find that the trial court abused its discretion. And in making that determination, we weigh the evidence's probative value against the risk that the jury might be misled or unfair prejudice or confusion might result.

(Citation omitted.) *Tucker Nursing Center v. Mosby*, 303 Ga. App. 80, 86 (4) (692 SE2d 727) (2010).

While the DVD recording had some probative value in illustrating the nature and extent of Kyla's injuries, it was primarily evidence on the issue of damages and, thus, was properly excluded from the liability phase of the trial. The recording depicted, most significantly, the effort and cost associated with maintaining Kyla's day-to-day existence and the emotional bond between mother and child.[7] Because the record supports a finding that the probative value of the

---

[7] The DVD contained seven segments, each depicting a different care-taking activity

recording on the issues of liability and causation was slight and was substantially outweighed by the risk of prejudicing the jury with the emotional nature of the scenes depicted, the trial court did not abuse its discretion in excluding it. See *Tucker Nursing Center v. Mosby*, 303 Ga. App. at 86-87 (4).

*Judgment affirmed. Doyle, J., concurs. Andrews, P. J., concurs in judgment only.*

DECIDED DECEMBER 1, 2010 — 

*Parks, Chesin & Walbert, David F. Walbert, Charles A. Mathis, Jr.*, for appellants.

*Forrester & Brim, Waymon H. Forrester, Carlock, Copeland & Stair, Thomas S. Carlock, Eric J. Frisch, Begnaud & Marshall, Andrew H. Marshall*, for appellees.

---

performed by Kyla's mother: (1) waking Kyla and carrying her from her bed to the sofa, (2) administering Kyla's breathing treatments, (3) feeding Kyla through a tube, (4) putting Kyla into a wheelchair and attaching braces to her arms and legs, (5) placing Kyla into a "stander," (6) exercising Kyla by moving and massaging her arms and legs, and (7) taking Kyla into the shower on a gurney, bathing her, and then putting her into a diaper. The video clips show the wide array of medical devices needed to maintain Kyla's health and the extensive care provided by Kyla's mother. During each video segment, Kyla's mother affectionately touches Kyla, evoking what appear to be smiles from the child. The trial court observed: "If there is anyone in this room who could look at those video clips and not have an emotional response, in my opinion, they don't have a heart rate."