BARNES, Presiding Judge.
A jury convicted Jonathan Goulding of two counts each of cruelty to children, aggravated assault, and aggravated battery after Goulding’s three-month-old baby was diagnosed with injuries consistent with “shaken baby syndrome.” Goulding raises five arguments on appeal, contending that: (1) the trial court improperly denied his motion to excuse a juror for cause; (2) the trial court erred in allowing the State to play a “Day in the Life” video of the injured child; (3) a jury instruction constituted an illegal comment on the evidence; (4) Goulding’s right to be present during a critical stage of his trial was violated when a seated juror was dismissed; and (5) the trial court erred by denying Goulding’s request to charge on accident. For the reasons that follow, we affirm the verdict.
1. We view the evidence on appeal in the light most favorable to the verdict. Smith v. State, 283 Ga. 237 (1) (657 SE2d 523) (2008). So viewed, the evidence shows that the victim was born three weeks early on January 1, 2008, and remained in the hospital for nineteen days due to some breathing and feeding difficulties. The mother returned to work on February 4, 2008, and Goulding cared for the baby until she came home, when he handed the baby to her and *350 returned to playing an online video game called World of Warcraft. Once when the mother came home for lunch, she found the baby propped up on the living room couch with a bottle while Goulding played World of Warcraft in the bedroom with earphones on. Goulding explained that the baby had been crying and he needed a break.
In mid-February, Goulding reported to the mother that the baby had appeared to have a seizure while he was eating, and they took the baby to the emergency room. The examining doctor diagnosed the problem as reflux and increased the amount of medication being administered to the child before he was fed. On several occasions Goulding called the baby’s mother (his wife) or his mother-in-law because the baby would not stop crying. His mother-in-law, who was a paramedic, testified that Goulding called her at work in March 2008 because the baby would not stop crying, and said he had been trying to burp the baby and heard a pop. The mother-in-law went to the apartment and found the baby screaming as if he were in pain, but upon examination she found no external signs of injury. He cried more with every movement, but an hour or two after the baby’s mother came home and administered Tylenol, the baby stopped crying. Goulding told his mother-in-law that the baby cried all the time when the baby’s mother was at work, but stopped as soon as she came home. Goulding said that sometimes he got frustrated enough to shake the baby, and his mother-in-law cautioned him and offered to come get the baby any time Goulding became too stressed to deal with him.
Later in March 2008, the baby had some unexplained bruises on his forearm, his calf, on the inside of both arms, and on his chest, which Goulding and the mother called to the pediatrician’s attention, fearing some kind of bleeding disorder. The pediatrician ordered blood work, which was normal, but was also concerned about the size of the baby’s head, which was growing bigger than expected. Measurements a week later on April 3, 2008, revealed that the baby’s head had continued to grow, so the pediatrician referred him to the emergency room for evaluation, and the pediatric emergency room doctor ordered a CAT scan. The scan revealed an unusually large amount of fluid build-up along with a small amount of blood between the baby’s brain and skull, but the baby was alert, awake, not fussy, and had a normal neurological exam with no sign of external injuries. After consulting with a pediatric neurosurgeon, the baby was not admitted to the hospital on April 3, 2008, but was seen by a pediatric neurosurgeon the following day. The baby was “happy and playful” with no outward signs of injury, and the neurosurgeon diagnosed the baby as having a benign hydrocephalus, or increased spinal fluid in the head, which might have caused a vein to tear slightly but had caused no trauma to the brain. The doctor saw no signs of brain in *351 jury, but planned to obtain an MRI the following week to determine whether the blood on the baby’s brain was caused by repetitive bleeding, and discharged the baby.
Five days later, on April 9, 2008, Goulding came to the emergency room because the baby was not breathing, was unresponsive, and had turned blue. Goulding told the triage nurse that the baby had “clenched up” after being given his medicine and quit breathing, and after the baby did not respond to chest compressions, Goulding put him in the car and brought him to the hospital.
The baby was stabilized and transferred to a nearby Tennessee hospital where a bed was available in the pediatric intensive care unit. A physician who was qualified as an expert in pediatric critical care and abusive head trauma testified that the baby was initially placed on a ventilator and given IV fluids to stabilize his breathing and circulation. The baby was unconscious and unresponsive, and his pupils did not react to light. The soft spot on his head where his skull had not yet fused was tight, indicating internal pressure. Lab work indicated the baby was anemic from blood loss, and a chest x-ray revealed that the baby had prior rib fractures that had begun to heal. Another CAT scan of the baby’s head revealed that the increased volume of fluid was pressing on his brain and causing the sutures where his skull plates came together to pull apart. The fluid was different colors due to both old blood and new blood from an acute injury, and the brain matter itself was swollen from either traumatic injury, lack of oxygen, or both. A neurosurgeon lowered the pressure on the baby’s brain by removing fluid with a syringe through the soft spot, and an examination of the fluid confirmed the presence of old and new blood.
An eye exam on April 10, 2008 revealed “literally hundreds” of hemorrhages extending to the edges of the retinas in both eyes. An MRI on April 11, 2008, confirmed old hemorrhages of different ages as well as very recent hemorrhages, and revealed bleeding deep within the brain itself, from parts of the brain that had been torn or sheared. After ruling out a clotting disorder or other possible causes, and considering the retinal hemorrhages, the healing rib fractures, the acute and old bleeds around the brain, and the bleeding within the brain, the pediatric critical care doctor diagnosed the baby with “abusive head trauma.” The doctor further opined that the baby suffered the final, most significant head trauma immediately before the baby stopped breathing on April 9, 2008, rather than experiencing a head trauma days earlier that grew worse over time. Finally, in his opinion, the baby’s injuries had been caused by chronic and acute abusive injury, consistent with someone having grasped the baby by *352 the chest and shaken him. The doctor thought the baby had a very poor prognosis and would never care for himself or even sit up, walk, or talk.
Although Goulding has not enumerated this issue as error, we find that the evidence was sufficient to enable a rational jury to find him guilty beyond a reasonable doubt of all the offenses for which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); Smith, 283 Ga. at 237-238 (1). See also former OCGA § 24-4-6 (conviction based on circumstantial evidence authorized where the evidence “exclude [s] every other reasonable hypothesis save that of the guilt of the accused”).[1]
2. Goulding contends that the trial court erred in denying his motion to excuse a juror for cause. Jurors are presumed to be impartial, and the burden of proving partiality lies with the party seeking to have the juror disqualified. Edenfield v. State, 293 Ga. 370, 384 (7) (a) (744 SE2d 738) (2013). “Whether a prospective juror should be excused for cause is committed to the discretion of the trial court, and... the discretion of the trial court in this respect is broad.” Sears v. State, 292 Ga. 64, 66 (2) (734 SE2d 345) (2012).
Here, the trial court asked the following general question of the panel, “Have you any prejudice or bias resting on your mind either for or against the accused Jonathan Michael Goulding?” Juror 9 raised her hand and explained, “I’m afraid if it’s a baby I would have a problem with it. Because I have a new grandson and I’m afraid that could affect me.” The State followed up, and the following exchange took place:
[STATE]: [Juror 9], the Judge asked you if you had any • — • if you could sit on this case and be impartial.
[JUROR 9]: I cannot[,] no.
[STATE]: Okay,. . . the State will present evidence and you will hear the instructions from the Judge. Is it your thought that you cannot listen to the evidence as —
[JUROR 9]: (Interposing) Not really. No.
[STATE]: And that’s based on your personal life experience. [JUROR 9]: (Nods head affirmatively.)
Defense counsel then questioned the juror as follows:
[DEFENSE COUNSEL]: Again the question before the Court at this particular moment is whether or not... you have any *353 bias one way or another against Mr. Goulding sitting here right this moment?
[JUROR 9]: Not against him, no.
[DEFENSE COUNSEL]: You think you could listen to the evidence that’s presented in this case and decide the case solely upon the evidence you hear in this case, in this courtroom and the law as the Judge presents it to you?
[JUROR 9]: I don’t want to say that I could because, like I say, it’s a baby.
Goulding then moved to strike Juror 9 for cause, arguing that she had indicated that she could not state she was impartial. The State disagreed, arguing that the juror only said it would be difficult for her, and stated affirmatively that she had no bias against Goulding. The trial court declined to excuse the juror for cause.
The parties began individual voir dire, which was not taken down. The parties then struck the jury, with Goulding using a total of 8 strikes, the second against Juror 9. The State exercised 11 of its strikes, and after the jurors were excused for the evening, the trial court asked if anything about voir dire needed to be placed on the record. Goulding responded that he had moved to strike Juror 9 for cause, because she said during individual voir dire that she was not sure if she could be fair, and the trial court agreed that it had denied that motion.
In the hearing on Goulding’s motion for new trial, his trial counsel testified that he reviewed his notes from the individual voir dire and had written about Juror 9, “Not sure if I can be fair.” According to the hearing transcript, trial counsel’s notes were admitted as an exhibit, but neither party has cited to them, they are not included with the hearing transcript, and their location in the record is not otherwise obvious. Regardless, trial counsel testified that he did not recall anything else about Juror 9’s individual voir dire that would further illuminate the issue, even after refreshing his recollection with his personal notes.
Goulding argues on appeal that Juror 9 consistently and unequivocally swore she could not be a fair and impartial juror, but that the record was distorted and the trial court erroneously concluded that the juror stated only that she would find it difficult to serve on the jury. The juror was not questioned extensively on the record by the court or the parties. However, while the transcript establishes that the juror said she could not be fair because a baby was involved, it also establishes that she stated affirmatively that she had no bias or *354 prejudice against Goulding.
[F]or a juror in a criminal case to be excused for cause on the statutory ground that her ability to be fair and impartial is substantially impaired, it must be shown that she holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court’s charge on the evidence.
(Citation omitted.) Poole v. State, 291 Ga. 848, 852 (3) (734 SE2d 1) (2012). “A prospective juror’s doubt as to his or her own impartiality does not demand as a matter of law that he or she be excused for cause. Nor is excusal required when a potential juror expresses reservations about his or her ability to put aside personal experiences.” Holmes v. State, 269 Ga. 124, 126 (2) (498 SE2d 732) (1998) (citations omitted).
Here, Juror 9 expressly stated that she held no bias against Goulding, and the trial court did not abuse its discretion in declining to excuse her for cause. See Daniel v. State, 296 Ga. App. 513, 520-522 (6) (675 SE2d 472) (2009) (juror’s doubt as to her impartiality did not demand as a matter of law that she be excused for cause).
3. Goulding contends that the trial court erred in allowing the State to play a “Day in the Life” video of the baby at age 19 months that established how profoundly damaged he was. Goulding argues' that he never contested the severity and permanency of the baby’s brain damage, only the allegation that he was responsible for inflicting the injuries that caused the damage, his defense being that the injuries were caused by accident, natural causes, or other people who had access to the baby. Further, he argues, the baby’s mother was a crucial witness against him, and the video portrayed her in a wholly sympathetic light while she cared for the baby’s needs while he wore shirts expressing his love for his mother.
The video undoubtedly contains, as Goulding describes them, “gut-wrenching images,” but
[a]ny evidence is relevant which logically tends to prove or to disprove a material fact which is at issue in the case, and every act or circumstance serving to elucidate or to throw light upon a material issue or issues is relevant. The trial court has great discretion to determine relevancy and materiality of evidence, and admission is favored in doubtful cases. The admission of relevant evidence that is challenged *355 on the basis that its probative value is outweighed by its prejudicial impact is within the sound discretion of the trial court.
(Citations and punctuation omitted.) Brooks v. State, 281 Ga. 514, 517 (3) (640 SE2d 280) (2007).
The State filed a motion in limine seeking permission to introduce videos of the baby taken before and after he sustained a severe head injury. Goulding was indicted for cruelty to children for maliciously causing the victim cruel and excessive pain in one count by inflicting a traumatic brain injury on him and in a second count by fracturing his ribs. Goulding was further indicted for aggravated battery for maliciously causing the victim bodily harm in one count by rendering his brain useless and depriving the victim of the use of his brain, and in a second count by rendering his ribs useless by fracturing them. The State argued in its motion in limine that videos taken in February and March 2008 established that the baby had been functioning normally and acting appropriately for his age, while the day-in-the-life video taken in August 2009 demonstrated that the baby’s brain was rendered useless by Goulding’s actions, and illustrated the nature and extent of the brain injury.
In a lengthy hearing, the trial court reviewed the entire video and heard argument. While the unredacted video played, Goulding made his objections to the length of the video, to portions during which the camera lingered on, for example, the baby’s feeding tube, without apparent purpose, to the extended length of time spent performing tasks while the mother explained the processes, and to the relevance of showing the mother exercising the baby’s ankles. Goulding also noted that, while there was no dispute that an injury had occurred, he could not determine at the time of the hearing whether the specific deficits shown in the video were medically related to the alleged injury that occurred in April 2008. Finally, Goulding noted at the motions hearing that while the State initially charged him with having committed these crimes on April 9, 2008, it had reindicted him for having committed these crimes between January 1,2008, and April 9, 2008, which made the case “far, far more complicated.” He was concerned that the jury would decide the case based not on what happened in 2008, but on the child’s current condition.
The State agreed to redact any captions, certain portions of the video, and the audio. The court held that, if otherwise properly authenticated, the video was admissible to the extent it sought to prove the extent and nature of the baby’s injuries, which was probative and relevant to whether the child was caused cruel and excessive physical pain and whether a member of his body was rendered *356 useless. Based on the State’s offer of proof as to other testimony, the trial court found that the video was probative and that its relevance and probative value outweighed any prejudicial effect.
Goulding did not raise any objections at the hearing on the State’s motion in limine or at trial regarding the clothing the baby wore in the post-injury video, nor did he argue that the video unfairly portrayed the mother in the best possible light or that his absence from the video unfairly implied that he had been excluded from the baby’s life because he was guilty of the charged crimes. Further, while Goulding argues on appeal that the video was cumulative of testimony about the extent of the baby’s injuries, his argument at the hearing was that the State was required to establish through medical testimony that the injuries depicted in the video had been caused by the injuries he was accused of inflicting. These new arguments, raised for the first time on appeal, are therefore waived.
Further, while Goulding asserts that the video was unnecessarily prejudicial because he had never contested that the baby was severely injured, having pled not guilty to the charges, the State was required to prove each element of each offense beyond a reasonable doubt. Jones v. State, 272 Ga. 900, 903 (3) (537 SE2d 80) (2000) (plea of not guilty to indictment was challenge to all accusations contained therein, including venue, which State must prove beyond reasonable doubt). Further, the State has the authority “to choose the evidence needed to prove its case.” Ross v. State, 279 Ga. 365, 367 (2) (614 SE2d 31) (2005).
More exactly, a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the State chooses to present it. It is for this reason that the law in this State properly prevents a defendant from admitting certain crucial facts related to the crime, such as the cause of the victim’s death, in order to prevent the admission of evidence tending to prove that fact. A defendant cannot undermine the credibility of the State’s story by selectively admitting certain incriminating evidence to prevent the jury from receiving that evidence.
(Punctuation and footnotes omitted.) Id.
In a case that is physical precedent only,[2] this court affirmed a trial court’s exclusion of a day-in-the-life video during the liability *357 portion of a medical malpractice trial “on the ground that the evidence on the DVD related to damages, not liability, and that it was unduly prejudicial in that it played upon the jury’s sympathies.” Kesterson v. Jarrett, 307 Ga. App. 244, 252 (3) (704 SE2d 878) (2010), overruled on other grounds, Kesterson v. Jarrett, 291 Ga. 380 (728 SE2d 557) (2012) (Court of Appeals erred in affirming trial court’s grant of defendant’s motion to exclude the injured child herself from the courtroom during the liability phase of the trial). Kesterson is not controlling here. First, this court found no abuse of discretion in the trial court’s decision to exclude the video, not a decision to include it. Further, the issues that had to be determined during the liability phase of the civil trial in Kesterson were more limited than those that had to be determined during the guilt-innocence phase of this criminal trial. Here, the State had to prove all of the elements of the charged crimes, which included proving cruel and excessive pain and bodily harm to support the cruelty to children and aggravated battery charges, as outlined previously.
The trial court committed no abuse of discretion in admitting the video into evidence.
4. Goulding contends that the trial court erred in giving the following jury instruction: “Members of the jury, if you find from the evidence presented to you that the Defendant made an attempt to influence a witness, you may, in your discretion, consider it as evidence of consciousness of guilt.” Goulding excepted to the charge “pursuant to pretrial charge conference.”
Goulding’s objection during the charge conference was that the evidence presented was not “sufficient to raise this particular issue and to charge the jury on this issue,” and also that the charge “ends up almost becoming a burden-shift[ing] kind of thing” that was inappropriate “both factually and in terms of language.”
Goulding concedes on appeal the existence and admissibility of evidence showing that he had attempted to convince the baby’s mother to claim that her father had abused the baby and to lie about whether alcohol had been present in their home. Nevertheless, Goulding argues that case law has established that any jury charge on consciousness of guilt is error. Goulding did not object to the charge on this ground at trial, and thus, absent plain error, has waived his right to argue it on appeal. OCGA § 17-8-58 (b) (failure to object “shall *358 preclude appellate review . . . unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties”).
Giving this charge did not constitute plain error. Addressing a similar argument in the context of an ineffective assistance of counsel claim, our Supreme Court recently stated:
Appellant does not point to any case holding that this charge is incorrect, and it appears that neither this Court nor the Court of Appeals has held that such a charge is error. In fact, the Court of Appeals has approved of the charge. See Williams v. State, 171 Ga. App. 934 (3) (321 SE2d 429) (1984).
Daughtry v. State, 296 Ga. 849, 860 (2) (h) (770 SE2d 862) (2015). Accordingly, Goulding has failed to prove any error rising to the level of plain error.
Goulding also argues that the charge was not balanced because it failed to state that an attempt to influence a witness could also be evidence of innocence as well as guilt. Goulding did not object to the charge on this ground at trial, and absent plain error, has waived his right to argue it on appeal. We find no plain error in this regard.
Finally, Goulding argues that the charge as given constituted an improper comment on the evidence in violation of former OCGA § 17-8-57. That Code section provided:
It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give.[3]
Although Goulding did not object to the charge on this ground, the failure to object to such a violation “does not waive the issue on *359 appeal; on appeal, the issue is simply whether there was such a violation.” Reese v. State, 289 Ga. 446, 451 (5), n. 4 (711 SE2d 717) (2011).
Examining the plain wording of the charge, it is evident that it did not constitute an opinion by the trial court as to whether a fact at issue had or had not been proven. The court in giving the charge instructed the jury that if it found from the evidence that Goulding made an attempt to influence a witness, the jury was permitted, in its discretion, to consider that conclusion as evidence of consciousness of guilt. By giving the charge, the trial court did not intimate an opinion about whether the evidence actually established an attempt to influence a witness, nor did the court direct the jury to consider evidence of intimidation as an indication of guilt. The charge simply instructed the jury that it had the option to consider such a finding as evidence of guilt. See Collier v. State, 288 Ga. 756, 759 (4) (707 SE2d 102) (2011) (charge that witness “may be” impeached, not that he “is” impeached, by proof of drug convictions was not an impermissible comment on the evidence).
5. Goulding argues that the trial court violated his right to be present during a critical stage of his trial when a member of the jury was excused and an alternate took her place. A criminal defendant’s “right to be present, and see and hear, all the proceedings which are had against him on the trial before the Court” is embodied in our state Constitution. (Citation and punctuation omitted.) Hanifa v. State, 269 Ga. 797, 807 (6) (505 SE2d 731) (1998); 1983 Georgia Constitution, Art. I, Sec. I, Par. XII. “A colloquy between the trial judge and the jury is a part of the proceedings to which the defendant and counsel are entitled to be present.” Pennie v. State, 271 Ga. 419, 421 (2) (520 SE2d 448) (1999). “[Communication should be restricted, in the absence of the accused and his counsel, to matters relating to the comfort and convenience of the jury.” (Citation and punctuation omitted.) Stewart v. State, 165 Ga. App. 428, 430 (2) (300 SE2d 331) (1983) (trial court’s message to jurors through bailiff that they should “keep on trying” after they reported being deadlocked was not so material as to require presence of defendant and counsel).
In this case, at the end of the fourth day of trial, after the jurors were excused for the evening, the trial court said in open court with Goulding present, “[I]n regard to the juror issue that I talked to you about in chambers, she’s going to call my office in the morning and so we’ll need to resume in here, I guess about 8:40 — at 8:45 in the morning----So we can address anything that might need to be taken up in that regard.” The trial court then addressed an outstanding motion in limine and discussed scheduling issues with the parties before adjourning for the day.
*360 The next morning, again in open court with Goulding present, the trial court noted that, as it had discussed in chambers the previous day, a juror had been instructed by her doctor to come to his office if the pregnancy test she was to take that morning was positive. The juror had called the judge’s office at 8:15, seeking direction and was told to go to her doctor’s office. The trial court reported that the court’s assistant called the juror back, and determined that the juror was at her doctor’s office and did not know specifically when she would be done. The trial court stated that, based on conversations with both counsel the previous day, it understood that neither party objected to excusing the juror and substituting an alternate, particularly in light of Goulding’s concerns that his expert witness would only be able to testify that morning. Goulding’s counsel replied that, given the status of the juror and the case, he had no objection to excusing the juror because there were plenty of alternates. The State had no objection either, and the trial court and counsel discussed how best to notify the remaining jurors about the excusal.
When the jurors returned to the courtroom, the trial court notified them that the juror in question “had a medical situation this morning that her doctor advised that she needed to attend to,” and she had been excused from service by consent of all the parties. At that point, although the State had not rested, Goulding’s expert witness was called to testify in order to accommodate the witness’s schedule, and the trial resumed.
Goulding now argues that he was not present during the trial court’s colloquy with the juror, he did not waive his right to be present, and he was not consulted regarding the decision about whether to excuse the juror from further service or to delay the trial until the juror finished her doctor’s appointment and returned to court. We disagree. First, the trial court’s discussion with the juror at the end of the third day was apparently limited to her reporting to the judge the direction she had received from her doctor if a pregnancy test she was going to take the next morning turned out to be positive. This conversation plainly involved the juror’s “comfort and convenience,” and was not a critical stage of trial.
Further, the juror was not dismissed in Goulding’s absence at the end of the third day of trial; otherwise, as the State points out, the juror would not have been directed to call the judge’s office on the morning of the fourth day of trial to report in. The actual decision to excuse the juror took place in open court with Goulding present on the morning of the fourth day of trial. While he now argues that he was not consulted regarding the decision to dismiss the juror rather than wait an indeterminate length of time for her to return, thus possibly limiting the testimony of Goulding’s expert witness, he was present *361 during the critical phase when the decision to excuse the juror was made. Whether he agreed with the decision or not is not the issue; the issue is whether he was present when he had the constitutional right to be present, and in this case, he was.
6. Finally, Goulding contends that the trial court erred by denying his request to charge the jury on accident. Under OCGA § 16-2-2, “[a] person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence.” “To authorize a jury instruction on a subject, there need only be produced at trial slight evidence supporting the theory of the charge. Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law.” (Citation and punctuation omitted.) Jones v. State, 287 Ga. 770, 771-772 (2) (700 SE2d 350) (2010).
To establish an evidentiary foundation for an instruction on the affirmative defense of accident, the defendant admits the doing of the act charged but seeks to justify, excuse, or mitigate it. Accordingly, if a defendant does not admit to committing any act which constitutes the offense charged, he is not entitled to a charge on the defense of accident.
(Citation and punctuation omitted.) Durden v. State, 327 Ga. App. 173, 179 (6) (755 SE2d 909) (2014).
Goulding asserts that he was entitled to the accident charge because the jury heard evidence that he might have accidentally caused injuries to the baby by tossing him in the air, strapping him into his car seat too tightly, and shaking or poking him after he turned blue. But his defense at trial was not that he accidentally hurt the baby. In his closing argument, he denied he hurt the baby and argued that other people had access to the baby during the time frame in which he was injured. “Consequently, he was not entitled to a charge on the law of accident and the trial court did not err when it declined to give such a charge.” Wilson v. State, 279 Ga. 104, 105 (2) (610 SE2d 66) (2005).

Judgment affirmed.

McMillian, J., concurs. Ray, J., concurs fully and specially in Divisions 1 and 3-6 and in judgment only in Division 2.

 Former OCGA § 24-4-6 was reenacted in the revised Evidence Code as OCGA § 24-14-6.

 If an appeal is decided by a Division, a judgment in which all three judges fully concur is a binding precedent; provided, however, an opinion is physical precedent *357 only with respect to any Division of the opinion for which there is a concurrence in the judgment only or a special concurrence without a statement of agreement with all that is said.
Court of Appeals Rule 33 (a).

 OCGA§ 17-8-57 was amended effective July 1, 2015. The revised Code section still provides that a trial court’s intimation of the accused’s guilt requires a new trial, hut now also provides that, without a contemporaneous objection, a trial court’s intimation of whether a fact was or was not proven will result in a new trial only when the violation “constitutes plain error which affects substantive rights of the parties.”