**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 10, 2015**

# In the Court of Appeals of Georgia

A15A0841. GOULDING v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Jonathan Goulding of two counts each of cruelty to children, aggravated assault, and aggravated battery after Goulding's three-month-old baby was diagnosed with injuries consistent with "shaken baby syndrome." Goulding raises five arguments on appeal, contending that: (1) the trial court improperly denied his motion to excuse a juror for cause; (2) the trial court erred in allowing the State to play a "Day in the Life" video of the injured child; (3) a jury instruction constituted an illegal comment on the evidence; (4) Goulding's right to be present during a critical stage of his trial was violated when a seated juror was dismissed; and (5) the trial court erred by denying Goulding's request to charge on accident. For the reasons that follow, we affirm the verdict.

1. We view the evidence on appeal in the light most favorable to the verdict. *Smith v. State*, 283 Ga. 237 (1) (657 SE2d 523) (2008). So viewed, the evidence

shows that the victim was born three weeks early on January 1, 2008, and remained in the hospital for 19 days due to some breathing and feeding difficulties. The mother returned to work on February 4, 2008, and Goulding cared for the baby until she came home, when he handed the baby to her and returned to playing an online video game called World of Warcraft. Once when the mother came home for lunch, she found the baby propped up on the living room couch with a bottle while Goulding played World of Warcraft in the bedroom with earphones on. Goulding explained that the baby had been crying and he needed a break.

In mid-February, Goulding reported to the mother that the baby had appeared to have a seizure while he was eating, and they took the baby to the emergency room. The examining doctor diagnosed the problem as reflux and increased the amount of medication being administered to the child before he was fed. On several occasions Goulding called the baby's mother (his wife) or his mother-in-law because the baby would not stop crying. His mother-in-law, who was a paramedic, testified that Goulding called her at work in March 2008 because the baby would not stop crying, and said he had been trying to burp the baby and heard a pop. The mother-in-law went to the apartment and found the baby screaming as if he were in pain, but upon examination she found no external signs of injury. He cried more with every

2

movement, but an hour or two after the baby's mother came home and administered Tylenol, the baby stopped crying. Goulding told his mother-in-law that the baby cried all the time when the baby's mother was at work, but stopped as soon as she came home. Goulding said that sometimes he got frustrated enough to shake the baby, and his mother-in-law cautioned him and offered to come get the baby any time Goulding became too stressed to deal with him.

Later in March 2008, the baby had some unexplained bruises on his forearm, his calf, on the inside of both arms, and on his chest, which Goulding and the mother called to the pediatrician's attention, fearing some kind of bleeding disorder. The pediatrician ordered blood work, which was normal, but was also concerned about the size of the baby's head, which was growing bigger than expected. Measurements a week later on April 3, 2008, revealed that the baby's head had continued to grow, so the pediatrician referred him to the emergency room for evaluation, and the pediatric emergency room doctor ordered a CAT scan. The scan revealed an unusually large amount of fluid build-up along with a small amount of blood between the baby's brain and skull, but the baby was alert, awake, not fussy, and had a normal neurological exam with no sign of external injuries. After consulting with a pediatric neurosurgeon, the baby was not admitted to the hospital on April 3, 2008, but was

3

seen by a pediatric neurosurgeon the following day. The baby was "happy and playful" with no outward signs of injury, and the neurosurgeon diagnosed the baby as having a benign hydrocephalus, or increased spinal fluid in the head, which might have caused a vein to tear slightly but had caused no trauma to the brain. The doctor saw no signs of brain injury, but planned to obtain an MRI the following week to determine whether the blood on the baby's brain was caused by repetitive bleeding, and discharged the baby.

Five days later, on April 9, 2008, Goulding came to the emergency room because the baby was not breathing, was unresponsive, and had turned blue. Goulding told the triage nurse that the baby had "clenched up" after being given his medicine and quit breathing, and after the baby did not respond to chest compressions, Goulding put him in the car and brought him to the hospital.

The baby was stabilized and transferred to a nearby Tennessee hospital where a bed was available in the pediatric intensive care unit. A physician who was qualified as an expert in pediatric critical care and abusive head trauma testified that the baby was initially placed on a ventilator and given IV fluids to stabilize his breathing and circulation. The baby was unconscious and unresponsive, and his pupils did not react to light. The soft spot on his head where his skull had not yet

4

fused was tight, indicating internal pressure. Lab work indicated the baby was anemic from blood loss, and a chest x-ray revealed that the baby had prior rib fractures that had begun to heal. . Another CAT scan of the baby's head revealed that the increased volume of fluid was pressing on his brain and causing the sutures where his skull plates came together to pull apart. The fluid was different colors due to both old blood and new blood from an acute injury, and the brain matter itself was swollen from either traumatic injury, lack of oxygen, or both. A neurosurgeon lowered the pressure on the baby's brain by removing fluid with a syringe through the soft spot, and an examination of the fluid confirmed the presence of old and new blood.

An eye exam on April 10, 2008 revealed "literally hundreds" of hemorrhages extending to the edges of the retinas in both eyes. An MRI on April 11, 2008, confirmed old hemorrhages of different ages as well as very recent hemorrhages, and revealed bleeding deep within the brain itself, from parts of the brain that had been torn or sheared. After ruling out a clotting disorder or other possible causes, and considering the retinal hemorrhages, the healing rib fractures, the acute and old bleeds around the brain, and the bleeding within the brain, the pediatric critical care doctor diagnosed the baby with "abusive head trauma." The doctor further opined that the baby suffered the final, most significant head trauma immediately before the baby

5

stopped breathing on April 9, 2008, rather than experiencing a head trauma days earlier that grew worse over time. Finally, in his opinion, the baby's injuries had been caused by chronic and acute abusive injury, consistent with someone having grasped the baby by the chest and shaken him. The doctor thought the baby had a very poor prognosis and would never care for himself or even sit up, walk, or talk.

Although Goulding has not enumerated this issue as error, we find that the evidence was sufficient to enable a rational jury to find him guilty beyond a reasonable doubt of all the offenses for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); *Smith*, 283 Ga. at 237-238 (1). See also former OCGA § 24-4-6 (conviction based on circumstantial evidence authorized where the evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused")[1].

2. Goulding contends that the trial court erred in denying his motion to excuse a juror for cause. Jurors are presumed to be impartial, and the burden of proving partiality lies with the party seeking to have the juror disqualified. *Edenfield v. State*, 293 Ga. 370, 384 (7) (a) (744 SE2d 738) (2013). "Whether a prospective juror should

---

[1]Former OCGA § 24-4-6 was reenacted in the revised Evidence Code as OCGA § 24-14-6.

6

be excused for cause is committed to the discretion of the trial court, and ... the discretion of the trial court in this respect is broad." *Sears v. State*, 292 Ga. 64, 66 (2) (734 SE2d 345) (2012).

Here, the trial court asked the following general question of the panel, "Have you any prejudice or bias resting on your mind either for or against the accused Jonathan Michael Goulding?" Juror 9 raised her hand and explained, "I'm afraid if it's a baby I would have a problem with it. Because I have a new grandson and I'm afraid that could affect me." The State followed up, and the following exchange took place:

> [STATE]: [Juror 9], the Judge asked you if you had any — if you could sit on this case and be impartial.
>
> [JUROR 9]: I cannot[,] no."
>
> [STATE]: Okay, ... the State will present evidence and your will hear the instructions from the Judge. Is it your thought that you cannot listen to the evidence as –
>
> [JUROR 9]: (Interposing) Not really. No.
>
> [STATE]: And that's based on your personal life experience.

[JUROR 9]: (Nods head affirmatively.)

Defense counsel then questioned the juror as follows:

> [DEFENSE COUNSEL]: Again the question before the Court at this particular moment is whether or not ... you have any bias one way or another against Mr. Goulding sitting here right this moment?

> [JUROR 9]: Not against him, no.

> [DEFENSE COUNSEL]: You think you could listen to the evidence that's presented in this case and decide the case solely upon the evidence you hear in this case, in this courtroom and the law as the Judge presents it to you?

> [JUROR 9]: I don't want to say that I could because, like I say, it's a baby.

Goulding then moved to strike Juror 9 for cause, arguing that she had indicated that should could not state she was impartial. The State disagreed, arguing that the juror only said it would be difficult for her, and stated affirmatively that she had no bias against Goulding. The trial court declined to excuse the juror for cause.

The parties began individual voir dire, which was not taken down. The parties then struck the jury, with Goulding using a total of 8 strikes, the second against Juror

8

9. The State exercised 11 of its strikes, and after the jurors were excused for the evening, the trial court asked if anything about voir dire needed to be placed on the record. Goulding responded that he had moved to strike Juror 9 for cause, because she said during individual voir dire that she was not sure if she could be fair, and the trial court agreed that it had denied that motion.

In the hearing on Goulding's motion for new trial, his trial counsel testified that he reviewed his notes from the individual voir dire and had written about Juror 9, "Not sure if I can be fair." According to the hearing transcript, trial counsel's notes were admitted as an exhibit, but neither party has cited to them, they are not included with the hearing transcript, and their location in the record is not otherwise obvious. Regardless, trial counsel testified that he did not recall anything else about Juror 9's individual voir dire that would further illuminate the issue, even after refreshing his recollection with his personal notes.

Goulding argues on appeal that Juror 9 consistently and unequivocally swore she should not be a fair and impartial juror, but that the record was distorted and the trial court erroneously concluded that the juror stated only that she would find it difficult to serve on the jury. The juror was not questioned extensively on the record by the court or the parties. However, while the transcript establishes that the juror said

9

she could not be fair because a baby was involved, it also establishes that she stated affirmatively that she had no bias or prejudice against Goulding.

> [F]or a juror in a criminal case to be excused for cause on the statutory ground that her ability to be fair and impartial is substantially impaired, it must be shown that she holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence.

(Citation omitted.) *Poole v. State*, 291 Ga. 848, 852 (3) (734 SE2d 1) (2012). "A prospective juror's doubt as to his or her own impartiality does not demand as a matter of law that he or she be excused for cause. Nor is excusal required when a potential juror expresses reservations about his or her ability to put aside personal experiences. *Holmes v. State*, 269 Ga. 124, 126 (2) (498 SE2d 732) (1998) (citations omitted).

Here, Juror 9 expressly stated that she held no bias against Goulding, and the trial court did not abuse its discretion in declining to excuse her for cause. See *Daniel v. State*, 296 Ga. App. 513, 520-22 (6) (675 SE2d 472) (2009) (juror's doubt as to her impartiality did not demand as a matter of law that she be excused for cause).

10

3. Goulding contends that the trial court erred in allowing the State to play a "Day in the Life" video of the baby at age 19 months that established how profoundly damaged he was. Goulding argues that he never contested the severity and permanency of the baby's brain damage, only the allegation that he was responsible for inflicting the injuries that caused the damage, his defense being that the injuries were caused by accident, natural causes, or other people who had access to the baby. Further, he argues, the baby's mother was a crucial witness against him, and the video portrayed her in a wholly sympathetic light while she cared for the baby's needs while he wore shirts expressing his love for his mother.

The video undoubtedly contains, as Goulding describes them, "gut-wrenching images," but

> [a]ny evidence is relevant which logically tends to prove or to disprove a material fact which is at issue in the case, and every act or circumstance serving to elucidate or to throw light upon a material issue or issues is relevant. The trial court has great discretion to determine relevancy and materiality of evidence, and admission is favored in doubtful cases. The admission of relevant evidence that is challenged on the basis that its probative value is outweighed by its prejudicial impact is within the sound discretion of the trial court.

11

(Citations and punctuation omitted.) *Brooks v. State*, 281 Ga. 514, 517 (3) (640 SE2d 280) (2007).

The State filed a motion in limine seeking permission to introduce videos of the baby taken before and after he sustained a severe head injury. Goulding was indicted for cruelty to children for maliciously causing the victim cruel and excessive pain in one count by inflicting a traumatic brain injury on him and in a second count by fracturing his ribs. Goulding was further indicted for aggravated battery for maliciously causing the victim bodily harm in one count by rendering his brain useless and depriving the victim of the use of his brain, and in a second count by rendering his ribs useless by fracturing them. The State argued in its motion in limine that videos taken in February and March 2008 established that the baby had been functioning normally and acting appropriately for his age, while the day-in-the-life video taken in August 2009 demonstrated that the baby's brain was rendered useless by Goulding's actions, and illustrated the nature and extent of the brain injury.

In a lengthy hearing, the trial court reviewed the entire video and heard argument. While the unredacted video played, Goulding made his objections to the length of the video, to portions during which the camera lingered on, for example, the baby's feeding tube, without apparent purpose, to the extended length of time spent

12

performing tasks while the mother explained the processes, and to the relevance of showing the mother exercising the baby's ankles. Goulding also noted that, while there was no dispute that an injury had occurred, he could not determine at the time of the hearing whether the specific deficits shown in the video were medically related to the alleged injury that occurred in April 2008. Finally, Goulding noted at the motions hearing that while the State initially charged him with having committed these crimes on April 9, 2008, it had re-indicted him for having committed these crimes between January 1, 2008, and April 9, 2008, which made the case "far, far more complicated." He was concerned that the jury would decide the case based not on what happened in 2008, but on the child's current condition.

The State agreed to redact any captions, certain portions of the video, and the audio. The court held that, if otherwise properly authenticated, the video was admissible to the extent it sought to prove the extent and nature of the baby's injuries, which was probative and relevant to whether the child was caused cruel and excessive physical pain and whether a member of his body was rendered useless. Based on the State's offer of proof as to other testimony, the trial court found that the video was probative and that its relevance and probative value outweighed any prejudicial effect.

Goulding did not raise any objections at the hearing on the State's motion in limine or at trial regarding the clothing the baby wore in the post-injury video, nor did he argue that the video unfairly portrayed the mother in the best possible light or that his absence from the video unfairly implied that he had been excluded from the baby's life because he was guilty of the charged crimes. Further, while Goulding argues on appeal that the video was cumulative of testimony about the extent of the baby's injuries, his argument at the hearing was that the State was required to establish through medical testimony that the injuries depicted in the video had been caused by the injuries he was accused of inflicting. These new arguments, raised for the first time on appeal, are therefore waived.

Further, while Goulding asserts that the video was unnecessarily prejudicial because he had never contested that the baby was severely injured, having plead not guilty to the charges, the State was required to prove each element of each offense beyond a reasonable doubt. *Jones v. State*, 272 Ga. 900, 903 (3) (537 SE2d 80) (2000) (plea of not guilty to indictment was challenge to all accusations contained therein, including venue, which State must prove beyond reasonable doubt). Further, the State has the authority "to choose the evidence needed to prove its case." *Ross v. State*, 279 Ga. 365, 367 (2) (614 SE2d 31) (2005).

More exactly, a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the State chooses to present it. It is for this reason that the law in this State properly prevents a defendant from admitting certain crucial facts related to the crime, such as the cause of the victim's death, in order to prevent the admission of evidence tending to prove that fact. A defendant cannot undermine the credibility of the State's story by selectively admitting certain incriminating evidence to prevent the jury from receiving that evidence.

(Footnotes and punctuation omitted.) Id.

In a case that is physical precedent only,[2] this court affirmed a trial court's exclusion of a day-in-the-life video during the liability portion of a medical malpractice trial "on the ground that the evidence on the DVD related to damages, not liability, and that it was unduly prejudicial in that it played upon the jury's sympathies." *Kesterson v. Jarrett*, 307 Ga. App. 244, 252 (3) (704 SE2d 878) (2010), overruled on other grounds, *Kesterson v. Jarrett*, 291 Ga. 380 (728 SE2d 557) (2012) (Court of Appeals erred in affirming trial court's grant of defendant's motion to exclude the injured child herself from the courtroom during the liability phase of the

---

[2]"If an appeal is decided by a Division, a judgment in which all three judges fully concur is a binding precedent; provided, however, an opinion is physical precedent only with respect to any Division of the opinion for which there is a concurrence in the judgment only or a special concurrence without a statement of agreement with all that is said." Court of Appeals Rule 33 (a).

15

trial). *Kesterston* is not controlling here. First, this court found no abuse of discretion in the trial court's decision to *exclude* the video, not a decision to include it. Further, the issues that had to be determined during the liability phase of the civil trial in *Kesterton* were more limited than those that had to be determined during the guilt-innocence phase of this criminal trial. Here, the State had to prove all of the elements of the charged crimes, which included proving cruel and excessive pain and bodily harm to support the cruelty to children and aggravated battery charges, as outlined previously.

The trial court committed no abuse of discretion in admitting the video into evidence.

4. Goulding contends that the trial court erred in giving the following jury instruction: "Members of the jury, if you find from the evidence presented to you that the Defendant made an attempt to influence a witness, you may, in your discretion, consider it as evidence of consciousness of guilt." Goulding excepted to the charge "pursuant to pretrial charge conference."

Goulding's objection during the charge conference was that the evidence presented was not "sufficient to raise this particular issue and to charge the jury on

this issue," and also that the charge "ends up almost becoming a burden-shift[ing] kind of thing" that was inappropriate "both factually and in terms of language."

Goulding concedes on appeal the existence and admissibility of evidence showing that he had attempted to convince the baby's mother to claim that her father had abused the baby and to lie about whether alcohol had been present in their home. Nevertheless, Goulding argues that case law has established that any jury charge on consciousness of guilt is error. Goulding did not object to the charge on this ground at trial, and thus, absent plain error, has waived his right to argue it on appeal. OCGA § 17-8-58 (b) (failure to object "shall preclude appellate review unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties").

Giving this charge did not constitute plain error. Addressing a similar argument in the context of an ineffective assistance of counsel claim, our Supreme Court recently stated, "Appellant does not point to any case holding that this charge is incorrect, and it appears that neither this Court nor the Court of Appeals has held that such a charge is error. In fact, the Court of Appeals has approved of the charge. See *Williams v. State*, 171 Ga. App. 934 (3) (321 SE2d 429) (1984)." *Daughtry v. State*,

17

296 Ga. 849, 860 (2) (h) (770 SE2d 862) (2015). Accordingly, Goulding has failed to prove any error rising to the level of plain error.

Goulding also argues that the charge was not balanced because it failed to state that an attempt to influence a witness could also be evidence of innocence as well as guilt. Goulding did not object to the charge on this ground at trial, and absent plain error, has waived his right to argue it on appeal. We find no plain error in this regard.

Finally, Goulding argues that the charge as given constituted an improper comment on the evidence in violation of former OCGA § 17-8-57. That code section provided,

> It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give. [3]

---

[3]OCGA § 17-8-57 was amended effective July 1, 2015. The revised code section still provides that a trial court's intimation of the accused's guilt requires a new trial, but now also provides that, without a contemporaneous objection, a trial court's intimation of whether a fact was or was not proven will result in a new trial only when the violation "constitutes plain error which affects substantive rights of the parties."

18

Although Goulding did not object to the charge on this ground, the failure to object to such a violation "does not waive the issue on appeal; on appeal, the issue is simply whether there was such a violation." *Reese v. State*, 289 Ga. 446, 451 (5), n. 4 (711 SE2d 717) (2011).

Examining the plain wording of the charge, it is evident that it did not constitute an opinion by the trial court as to whether a fact at issue had or had not been proven. The court in giving the charge instructed the jury that *if* it found from the evidence that Goulding made an attempt to influence a witness, the jury was permitted, in its discretion, to consider that conclusion as evidence of consciousness of guilt. By giving the charge, the trial court did not intimate an opinion about whether the evidence actually established an attempt to influence a witness, nor did the court direct the jury to consider evidence of intimidation as an indication of guilt. The charge simply instructed the jury that it had the option to consider such a finding as evidence of guilt. See *Collier v. State*, 288 Ga. 756, 759 (4) (707 SE2d 102) (2011) (charge that witness "may be" impeached, not that he "is" impeached, by proof of drug convictions was not an impermissible comment on the evidence).

5. Goulding argues that the trial court violated his right to be present during a critical stage of his trial when a member of the jury was excused and an alternate took

her place. A criminal defendant's "right to be *present* and see and hear, *all the proceedings* which are had against him on the trial before the Court" is embodied in our state Constitution. (Citation and punctuation omitted.) *Hanifa v. State*, 269 Ga. 797, 807 (6) (505 SE2d 731) (1998); 1983 Georgia Constitution, Art. I, Sec. I, Par. XII. "A colloquy between the trial judge and the jury is a part of the proceedings to which the defendant and counsel are entitled to be present." *Pennie v. State*, 271 Ga. 419, 421 (2) (520 SE2d 448) (1999). '[C]ommunication should be restricted, in the absence of the accused and his counsel, to matters relating to the comfort and convenience of the jury." (Citation and punctuation omitted.) *Stewart v. State*, 165 Ga. App. 428, 430 (2) (300 SE2d 331) (1983) (trial court's message to jurors through bailiff that they should "keep on trying" after they reported being deadlocked was not so material as to require presence of defendant and counsel).

In this case, at the end of the fourth day of trial, after the jurors were excused for the evening, the trial court said in open court with Goulding present, "[I]n regard to the juror issue that I talked to you about in chambers, she's going to call my office in the morning and so we'll need to resume in here, I guess about 8:40 — at 8:45 in the morning.... So we can address anything that might need to be taken up in that

20

regard." The trial court then addressed an outstanding motion in limine and discussed scheduling issues with the parties before adjourning for the day.

The next morning, again in open court with Goulding present, the trial court noted that, as it had discussed in chambers the previous day, a juror had been instructed by her doctor to come to his office if the pregnancy test she was to take that morning was positive. The juror had called the judge's office at 8:15, seeking direction and was told to go to her doctor's office. The trial court reported that the court's assistant called the juror back, and determined that the juror was at her doctor's office and did not know specifically when she would be done. The trial court stated that, based on conversations with both counsel the previous day, it understood that neither party objected to excusing the juror and substituting an alternate, particularly in light of Goulding's concerns that his expert witness would only be able to testify that morning. Goulding's counsel replied that, given the status of the juror and the case, he had no objection to excusing the juror because there were plenty of alternates. The State had no objection either, and the trial court and counsel discussed how best to notify the remaining jurors about the excusal.

When the jurors returned to the courtroom, the trial court notified them that the juror in question "had a medical situation this morning that her doctor advised that

she needed to attend to," and she had been excused from service by consent of all the parties. At that point, although the State had not rested, Goulding's expert witness was called to testify in order to accommodate the witness's schedule, and the trial resumed.

Goulding now argues that he was not present during the trial court's colloquy with the juror, he did not waive his right to be present, and he was not consulted regarding the decision about whether to excuse the juror from further service or to delay the trial until the juror finished her doctor's appointment and returned to court. We disagree. First, the trial court's discussion with the juror at the end of the third day was apparently limited to her reporting to the judge the direction she had received from her doctor if a pregnancy test she was going to take the next morning turned out to be positive. This conversation plainly involved the juror's "comfort and convenience," and was not a critical stage of trial.

Further, the juror was not dismissed in Goulding's absence at the end of the third day of trial; otherwise, as the State points out, the juror would not have been directed to call the judge's office on the morning of the fourth day of trial to report in. The actual decision to excuse the juror took place in open court with Goulding present on the morning of the fourth day of trial. While he now argues that he was not

22

consulted regarding the decision to dismiss the juror rather than wait an indeterminate length of time for her to return, thus possibly limiting the testimony of Goulding's expert witness, he was present during the critical phase when the decision to excuse the juror was made. Whether he agreed with the decision or not is not the issue; the issue is whether he was present when he had the constitutional right to be present, and in this case, he was.

6. Finally, Goulding contends that the trial court erred by denying his request to charge the jury on accident. Under OCGA § 16-2-2, "[a] person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." "To authorize a jury instruction on a subject, there need only be produced at trial slight evidence supporting the theory of the charge. Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law." (Citation and punctuation omitted.) *Jones v. State*, 287 Ga. 770, 771-772 (2) (700 SE2d 350) (2010).

> To establish an evidentiary foundation for an instruction on the affirmative defense of accident, the defendant admits the doing of the act charged but seeks to justify, excuse, or mitigate it. Accordingly, if a

23

defendant does not admit to committing any act which constitutes the offense charged, he is not entitled to a charge on the defense of accident.

(Citation and punctuation omitted.) *Durden v. State*, 327 Ga. App. 173, 179 (6) (755 SE2d 909) (2014).

Goulding asserts that he was entitled to the accident charge because the jury heard evidence that he might have accidentally caused injuries to the baby by tossing him in the air, strapping him into his car seat too tightly, and shaking or poking him after he turned blue. But his defense at trial was not that he accidentally hurt the baby. In his closing argument, he denied he hurt the baby and argued that other people had access to the baby during the time frame in which he was injured. "Consequently, he was not entitled to a charge on the law of accident and the trial court did not err when it declined to give such a charge." *Wilson v. State*, 279 Ga. 104, 105 (2) (610 SE2d 66) (2005).

*Judgment affirmed. McMillian, J., concurs. Ray, J., concurs in judment only as to Division 2, otherwise concurs fully and specially.*

A15A0841.  GOULDING v. THE STATE.

RAY, Judge, concurring specially.

I write separately to address two points.  First, I join in judgment only to Division 2 of the majority opinion because I don't agree with all that is said therein, although I do agree with the result.  From the record which is before us, I believe that Juror 9 did express doubts that she could be fair and impartial to the Defendant because of the nature of the charges and the fact that she had a new grandchild.  It is true that the juror indicated that she had no personal bias against the Defendant, but it is equally true that the juror was afraid that the charges themselves along with her personal experiences could cause her to be unfair.

At the same time, however, the record before us is "cold".  We don't have the ability to see the juror, listen to her tone in answering the questions, and observe her non-verbal cues and demeanor.  The trial court did have that opportunity.  More importantly, because only a part of the individual voir dire of the juror was transcribed, we are also deprived of the ability to review the text of other questions to and answers given by Juror 9, which also may have impacted the decision of the trial court in leaving her in the juror pool.  As such, I am reluctant to interfere with the discretion of the trial court in denying the motion to excuse.

Secondly, even if we were to hold that it was error for the trial court to have refused to excuse Juror 9, in my view such error was not actually harmful to the Defendant as he excused such juror with a peremptory strike and had an excess of 5 peremptory strikes that he did not use. Under precedent from our Supreme Court, *Harris v. State*, 255 Ga. 464 (339 SE2d 712) (1986), however, the Defendant would have been entitled to a new trial. Respectfully, if given the opportunity, I urge our high court to revisit its holding in *Harris*.

Prior to *Harris*, "[t]he burden was upon the defendant to show that he was in some way injured by the [court's denial to strike a juror for cause]." (Citation omitted.) *Evans v. State*, 222 Ga. 392, 402 (14) (150 SE2d 240) (1966) (overruled by *Harris* at 465 (2)). A defendant's failure to strike the offending venire juror combined with the failure to utilize all of his peremptory strikes "[rendered] harmless a trial court's error in refusing to strike an unqualified juror." *Harris* at 465 (2). Rather than presuming harm, we required the defendant to satisfy a burden of showing some form of harm.

In *Harris*, our Supreme Court found that "a true determination of the harm caused by a trial court's refusal to strike an unqualified juror would require omniscience." (Citation omitted.) *Harris* at 465 (2). Therefore, it held, "[t]he

2

defendant's use of peremptory strikes. . . no longer play a role in our evaluation of the harm caused by the refusal to strike an unqualified juror." Id.

In a special concurrence in *Blankenship v. State*, 247 Ga. 590 (277 SE2d 505) (1981), former Justice Gregory laid out the argument for doing away with requiring a party to show the harm that they experienced as a result of the trial court's denial of a motion to strike for cause. In his concurrence, he set forth a hypothetical where the State was harmed due to the trial court's failure to strike a juror for cause.

> Suppose the court permits a juror to be impaneled who, on voir dire, has given answers disqualifying him. . . Assume that juror is number 36 and that another juror who is even more objectionable to the state is impaneled as number 39. Suppose as juror number 36 is placed upon the state in the selection process, a total of [ten] jurors have been selected, and the state has [one] challenge remaining while the defendant has[four]. What does the state do? If the state peremptorily challenges number 36 it will have no way to eliminate number 39. So, the state does not challenge number 36. Neither does the defendant. Then suppose neither party challenges juror number 37. The panel of [twelve] is complete. The state has remaining one unused challenge. It just does not follow that it is harmless error to wrongfully excuse a juror as being disqualified. . . simply because the state does not use all its peremptory challenges and therefore could have been expected to use a challenge to eliminate the juror even if impaneled. There are too many variables which may give rise to the non-use of a peremptory challenge.

(Punctuation omitted.) Id at 897.

3

On a basic level, I agree that this argument makes sense. There are many variables at play in a party's use of peremptory strikes during the jury selection process. However, this doesn't mean that a trial court's error should be per se reversible. A party should still have to at least attempt to show some harm. In Justice Gregory's hypothetical, the State could easily proffer on appeal that it was saving its challenge for juror number 39. In fact, the State could have put this fact on the record at the end of jury selection, perfecting the record for purposes of appeal. This would explain why it had a remaining strike, and if in fact juror 36 should have been struck for cause, it might establish harm.[1]

A defendant is not harmed by being 'forced' to exhaust a peremptory strike on an objectionable juror if he otherwise would not have used that strike. Here, the Defendant was likely not harmed through his use of a strike to remove Juror 9. Had the trial court struck Juror 9 for cause, the Defendant would have finished jury

---

[1] For those who argue that such a process would be too speculative and unwieldy, I point to the procedure used in challenging the strikes of the opposing party under *Batson v. Kentucky*, 476 U.S. 79 (1986). In a Batson challenge, the party striking a juror for an alleged impermissible purpose is required to justify that strike after the fact and the Court is called upon to decide if the non-discriminatory reason given for the strike is genuine or merely a pre-text. Certainly, then, the Court could likewise determine the sincerity of counsel's claim that it would have struck other jurors had it not been forced to use a peremptory strike on a juror who should have been struck for cause.

4

selection with six strikes remaining rather than five.[2]  I do not see how the Defendant

suffered any form of harm by the trial court's failure to strike Juror 9 for cause when

he was still capable of striking all of the jurors he desired.  The Defendant should not

be given a new trial on the basis of an error that did not harm him.

Applying an automatic presumption of harm is by far the minority position

among our sister states.  Thirty-nine states, as well as the District of Columbia,

require a party to show some form of harm or prejudice to prevail on an appeal of a

trial court's failure to excuse a venire juror for cause.[3]  Their individual rules

---

[2]Here, I assume for the sake of argument that the trial court should have struck
juror number 9.

[3]See *Hammock v. State*, 52 P3d 746, 750 (Alaska App. 2002) (Defendant used
peremptory challenge to strike juror A.B., who the trial court erroneously failed to
strike for cause, then exhausted his challenges.  Court held that even identifying that
he would have struck juror S.A. had the court struck A.B. for cause was not sufficient
to establish prejudice, as he did not "demonstrate some reason to believe that one or
more of the jurors who decided his case were, in fact, not fair."(Citation omitted.));
*State v. Sutherland*, 231 W. Va. 410, 418-420 (2013) (overturning prior precedent to
require defendant to show prejudice and stating that Georgia is in the clear minority
of states who do not require a showing of prejudice.); *State v. Kuhs*, 224 P3d 192, 198
(Ariz. 2010) (No error if defendant peremptorily strikes juror and does not raise a
claim that the jury that decided his case was not fair and impartial); *State v. Wilkins*,
693 NW2d 348, 351 (Iowa 2005) (same); *State v. Daniel*, 606 NW2d 532, 535 (S.D.
2000) (same); *State v. Manning*, 19 P3d 84, 97 (Kan. 2001) (overruled on other
grounds by *State v. King*, 204 P3d 585 (Kan. 2009)) (same); *State v. Ramos*, 808 P2d
1313, 1315 (Idaho 1991) (same); *Miles v. State*, 85 SW3d 907, 911 (Ark. 2002) ("the
loss of a peremptory challenge cannot be reviewed on appeal. . . the appeal focuses

5

specifically on those who were seated on the jury. . . a challenge must show that the appellant was forced to accept a juror who should have been excused for cause."(Citations and punctuation omitted.)); *State v. DiFrisco*, 645 A2d 734, 753 (N.J. 1994) (same); *Harmon v. State*, 248 P3d 918, 932 (Okla. Crim. App. 2011) (same); *State v. Mannix*, 326 P3d 1236, 1242 (Or. App. 2014) (same); *State v. Schmeiderer*, 319 SW3d 607, 633 (Tenn. 2010) (same); *State v. Maestas*, 299 P3d 892, 911 (Utah 2012) (same); *State v. Fire*, 34 P3d 1218, 1224 (Wash. 2001) (same); *Preciado v. State*, 318 P3d 176, 179 (Nev. 2014) (Defendant cannot be prejudiced by juror who did not sit on jury); *State v. Lindell*, 629 NW2d 223, 251 (Wi. 2001) (same); *Lecato v. State*, 763 A2d 91 (Del. 2000) (Defendant may not challenge denial of motion to strike if defendant retained any unused peremptory challenges); *Ware v. State*, 759 A2d 764, 771 (Md. App. 2000) (same); *State v. Isiah*, 781 P2d 293, 302 (N.M. 1989) (same); *State v. Jaster*, 690 NW2d 213, 217 (N.D. 2004) (same); *State v. Green*, 392 SE2d 157, 159 (S.C. 1990) (same); *People v. Whalen*, 294 P3d 915, 951 (11-12) (Cal. 2013) (Defendant cannot challenge trial court's alleged erroneous denial of motion to strike when he fails to utilize all peremptory challenges and does not express dissatisfaction with the seated jury.); *Weisheit v. State*, 26 NE3d 3, 13 (Ind. 2015) (same); *People v. Holliday*, 376 NW2d 154, 162 (Mich. App. 1985) (same); *State v. Percy*, 595 A2d 248, 253 (Vt. 1990) (same); *State v. Barnville*, 445 A2d 298, 301 (R.I. 1982); *State v. Omar*, 43 A3d 766, 768 (Conn. App. 2012) (Defendant must not only utilize all peremptory challenges, but also must seek additional challenges from the court and have that request denied before being able to appeal trial court's denial of motion to strike for cause); *State v. Iuli*, 65 P3d 143, 152 (Haw. 2003) (same); *People v. Bowens*, 943 NE2d 1249, 1257 (Ill. App. 2011) (same); *State v. Clemmons*, 639 SE2d 110, 112 (N.C. App. 2007) (same); *Hernandez v. State*, 390 SW3d 310, 316 (Tex. Crim. App. 2012) (same); *Jones v. United States*, 27 A3d 1130, 1150 (D.C. App. 2011) (Court does not even evaluate whether trial court erred in refusing to strike juror for cause if defendant strikes that juror); *State v. Jamison*, 365 SW3d 623, 627 (Mo. App. 2012) (same); *Albarran v. State*, 96 So3d 131, 162 (C) (Ala. Crim. App. 2011) ("failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike."(Citation omitted.)); *Commonwealth v. Chambers*, 685 A2d 96, 107 (Pa. 1996) ("harmless error when a juror who should have been excluded for cause is actually excluded by a peremptory challenge, if the defense does not exhaust its peremptory challenges." (Citations

6

range from a per se rule that there is no harm if the party fails to utilize all available peremptory strikes, to a rule which not only requires a party to exhaust all strikes, but also to request additional strikes and state who they would use them on, to a rule which merely requires a party to show on the record some form of harm. The one thing all these states have in common is that they have abandoned a per se rule of prejudice in the event of a trial court erroneously failing to strike a juror for cause.

Since *Harris* was decided, the United States Supreme Court has issued two opinions which are relevant to this discussion. In *Ross v. Oklahoma*, 487 U.S. 81 (1988), the Supreme Court "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. . . So long as the jury that sits is impartial, the fact that the defendant had to use a

---

omitted.)); *Street v. State*, 592 So2d 369, 370 (Fla. Dist. Ct. App. 1992) (Defendant "must identify a specific juror whom he otherwise would have struck peremptorily. This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted."); *Commonwealth v. Seabrooks*, 743 NE2d 831, 837 (Mass. 2001) (same); *State v. Prtine*, 784 NW2d 303, 311 (Minn. 2010) (same); *Johnson v. State*, 68 So3d 1239, 1247 (Miss. 2011) (same); *State v. Daly*, 775 NW2d 47, 70 (Neb. 2009) ("even the erroneous overruling of a challenge for cause will not warrant reversal unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges."); *State v. Hale*, 892 NE2d 864, 888 (Ohio 2008) (same).

peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." (Citations and punctuation omitted.) Id at 88. In fact, according to the Supreme Court, peremptory challenges are "a means to achieve the end of an impartial jury." Id. As long as the defendant ultimately had an impartial jury, any potential error is truly harmless error.

Although this is an interpretation of the Federal Constitution, and is merely a floor for Georgia criminal procedure and our interpretation of the Georgia Constitution, I believe that it should influence how we view the issue in Georgia. Members of our courts have come to the same conclusion applying Georgia law with the backdrop of federal law. Former Justice Carley (joined by former Justice Sears) stated in his dissent in *Fortson v. State*, 277 Ga. 164, 168-172 (578 SE2d 39) (2003), that "[t]he mere exhaustion or waste of peremptory strikes should not dictate that a given action regarding a disqualified juror is either invariably harmless or necessarily harmful. Instead, the focus under current Georgia law should be on whether any unqualified juror was seated as the ultimate result of errors with respect to jurors challenged for cause." (Citation omitted.) Id at 170.

Analyzing a slightly different issue, our Supreme Court unanimously has come to the same conclusion. In *Barner v. State*, 263 Ga. 365, 367 (4) (434 SE2d 484)

8

(1993), our Supreme Court considered whether a statute which modified the number of strikes given to parties in criminal cases should be given retroactive effect. The Court held that "[t]he exercise of peremptory strikes has long been recognized as a procedure created to assist litigants in obtaining a fair and impartial jury and not an independent substantive right. The substantive right involved is the right to an impartial jury and peremptory strikes are merely one possible procedure that can be used to obtain such a jury." (Citations omitted.) Id.

In *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), the United States Supreme Court was confronted with the same issue again; does the fact that a defendant exercised a peremptory strike to cure an erroneous denial of a motion to strike a venire juror require the reversal of a conviction? The Court held,

> [the defendant] had the option of letting [the juror] sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal. Instead, [the defendant] elected to use a challenge to remove [the juror] because he did not want [him] to sit on his jury. This was [the defendant's] choice. The District Court did not demand. . . that [the defendant] use a peremptory challenge curatively. In choosing to remove [the juror] rather than taking his chances on appeal, [the defendant] did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury.

(Citations, punctuation and footnote omitted.) Id at 315-316. The peremptory strikes themselves are not the substantive right guaranteed to the accused. The substantive right is the right to a trial by a fair and impartial jury. The strikes are merely a means to an end, a way to ensure litigants obtain a fair and impartial jury.

Allowing a defendant an automatic reversal in the event a biased juror is not struck for cause in essence gives the defendant a "free second bite at the apple." Yes, it does give the prosecution a reason not to fight to keep a juror who is questionably biased in the jury pool, but that incentive is already there. A defendant who gets convicted by a jury with even one biased juror has a constitutional claim for reversal. See *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (defendants are "entitled to be tried by 12, not 9 or even 10, impartial unprejudiced jurors"). The inclusion of even a single biased juror will require a reversal on appeal. Defendants are faced with a choice: strike the venire juror believed to be biased using a peremptory strike, or save the strike for someone believed to be even more objectionable and leave the potentially biased juror on the panel, saving a basis for appeal in the event of conviction.

In the event the defendant fails to strike the venire juror and retains strikes, there is likely no harmful error. He had the ability to remove that alleged influence.

10

In the event the defendant strikes the potentially biased venire juror and fails to utilize all of his allotted strikes, there likely is no harmful error. His strikes served the purpose they were intended to serve. In both instances, there should be no reversal if the defendant suffered no harm. However, if the defendant utilizes all of his strikes, including one on a venire juror who should have been struck for cause, and ultimately is unsatisfied with the petit jury, then some harm is possibly present. It is this situation in which we should focus our scrutiny, not in other situations where no possible harm could exist.